**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| HENRY ROGER WOLFORD *ex rel.* TODD ALBERT WOLFORD, | |
| Plaintiff, | Civil Action No. 11-5776 (MAS) (DEA) |
| v. | **MEMORANDUM OPINION** |
| MATTHEW QUINN, *et al.*, | |
| Defendants. | |

**SHIPP, District Judge**

On March 3, 2011, Todd Wolford ("Wolford") was shot and killed in his front yard by an officer of the Ocean Township Police Department. Plaintiff Henry Wolford ("Plaintiff"), Wolford's father, commenced this civil rights action on behalf of his deceased son. He asserts Fourth Amendment claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act against the officer who fired the fatal shot, Patrolman Matthew Quinn; Quinn's direct supervisor, Corporal Adam Mogul; the Township of Ocean; and the Township's Chief of Police, Gerhard Frenz.

Before the Court are Defendants' motions for summary judgment. Upon careful consideration of the parties' submissions, the Court decides the motions without oral argument pursuant to Local Civil Rule 78.1. For the reasons stated below, and for other good cause shown, the motions are granted.

I.     **Background**

    A.     **The Events of March 3, 2011**

The following is a summary of the facts relevant to the disposition of Plaintiff's claims. As it must on a motion for summary judgment, the Court construes the evidence in the light most favorable to Plaintiff, the non-moving party in this case.

On the evening of March 3, 2011, Wolford spoke on the telephone with his friend Edward Kmieciak. According to Kmieciak's account, Wolford expressed dissatisfaction with his professional and personal life and seemed depressed. Kmieciak called the Ocean Township Police Department at approximately 9:44 p.m. to report that Wolford may be contemplating suicide. (Quinn Dep. 48, 61; Compl. ¶ 12.)

The Department dispatched a squad of three police officers commanded by Corporal Adam Mogul to check on Wolford. (Mogul Dep. 40.) Mogul, a veteran officer with well over ten years experience on patrol, supervised the two junior members of the squad, Patrolman Matthew Quinn, who joined the Department in 2007, and Special Officer Jeremy Samuels, then a recent graduate from the police academy. (Quinn Dep. 43; Mogul Dep. 15, 36-37.) All three officers were clad in standard police uniforms and driving marked police cruisers. (Mogul Dep. 63.)

Arriving at Wolford's residence at approximately 10:00 p.m., Quinn and Samuels parked their police cruisers on Maple Street in view of Wolford's front door. (Quinn Dep. 63-64, 68; Compl. ¶ 14.) Wolford's house was a low, one-story structure with a small front yard. On the night of March 3, the carriage lights on both sides of the front door were illuminated and a pickup truck sat in the driveway to the left of the house. Although curtains covered the windows, the officers saw light coming from inside the house. (Quinn Dep. 67.)

Quinn approached the left side of the house, where he found a side entrance that opened onto the driveway. (Quinn Dep. 71-72.) Samuels, meanwhile, proceeded to the front of the house

and peered into a semi-circular window in the front door. (Samuels Dep. 24-25.) He saw a man, later identified as Wolford, sleeping shirtless on a couch. Samuels reported this to Quinn and Mogul, the latter having joined the other two officers in the front yard. (Quinn Dep. 74-75.)

After conferring with Samuels and Quinn, Mogul walked over to the front door, knocked, and commanded Wolford to "wake up" and open the door. (Samuels Dep. 27; Quinn Dep. 78-79; Mogul Dep. 62, 68.) Peering through the door's semi-circular window, Mogul saw Wolford rise and walk toward the rear of the house where he picked up a Glock handgun from a table. (Mogul Dep. 71-73.) Mogul continued to watch as Wolford "racked the slide" of the pistol, and turned back towards the front door. (Mogul Dep. 73-74.) Mogul knew from his experience with Glock handguns that the slide was used to move a bullet into the firing chamber, eject a bullet from the chamber, or confirm that the gun was unloaded. (Mogul Dep. 78-80.)

Mogul cried out "he's got a gun" to Quinn and Samuels, who were standing in the driveway and could not see what was happening inside the house. (Mogul Dep. 91.) As Wolford approached the door, Mogul retreated backwards across the front yard towards the street. (Mogul Dep. 91; Quinn Dep. 78; Samuels Dep. 28.) Quinn sought cover on the far side of the pickup truck in Wolford's driveway. (Quinn Dep. 84-85.) From there, Quinn could see both the house's front door and Mogul. (Quinn Dep. 86-88.)

Mogul was approximately 20 feet from the door when Wolford emerged with the pistol raised. (Mogul Dep. 82-86, 87-89; Quinn Dep. 88.) At this point, all three officers had their guns drawn and were yelling at Wolford to drop the weapon. (Mogul Dep. 89-90; Quinn Dep. 90-92.) Mogul, believing that Wolford was aiming the gun at him, stumbled and fell as he rushed for cover in the vicinity of a nearby tree. (Mogul Dep. 90-93; Quinn Dep. 99.) As Mogul struggled to recover his footing, he heard a *click* as Wolford pulled the trigger on his pistol. Mogul, who

3

knew Wolford's weapon was a Glock, recognized the sound as a "dry fire." (Mogul Dep. 96.) From his position 10 to 20 feet from Wolford, Quinn heard the same sound but came to a different conclusion about its significance: Quinn thought that Wolford had disengaged his pistol's safety mechanism. (Quinn Dep. 95, 98.)

When Mogul regained his balance, he raised his weapon and issued a final command to Wolford to drop the gun. (Mogul Dep. 98.) At that instant, Quinn fired a single shot. Quinn's bullet struck Wolford in the chest, killing him. (Mogul Dep. 102-103, 106). Mogul reported the shooting to police dispatcher at 10:02 p.m. (Mogul Dep. 119-20.)

Subsequent investigation revealed that there had been no bullets in Wolford's handgun. (Quinn Dep. 102.)

### B. The Complaint

Counts One, Two and Three of the Complaint allege that the use of deadly force violated Wolford's Fourth Amendment right to be free from unreasonable seizure. Count One asserts that Quinn and Mogul are liable for the supposed violation under § 1983. Count Two also invokes § 1983, but the claim is directed at Ocean Township and Police Chief Gerhard Frenz on the theory that they failed to properly train officers Quinn and Mogul. Count Three is identical to Count One, except that the claim against the officers is predicated on a New Jersey state statute, N.J. Stat. Ann. § 10:6-2.

Count Four of the Complaint, which the Court declines to address on jurisdictional grounds, seeks the production of certain documents relevant to the policies of the Ocean Township Police Department and the official inquiry into Wolford's death pursuant to the New Jersey Open Public Records Act, N.J. Stat. Ann. § 47:1A-1 *et seq.*

## II. Summary Judgment Standard

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A district court considers the facts drawn from the "materials in the record, including depositions, documents, electronically stored information, affidavits . . . or other materials" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Fed. R. Civ. P. 56(c)(1)(A); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002) (internal quotations omitted). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the non-moving party. *Id.* at 248-49. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48.

## III. Analysis

After a careful review of the record in this tragic case, the Court is convinced that no rational factfinder could conclude that Patrolman Quinn's decision to use deadly force was unlawful. The Defendants are therefore entitled to summary judgment on each of Plaintiff's civil rights claims.

### A. Patrolman Quinn Acted Reasonably

The constitutional inquiry into a police officer's use of force to apprehend or subdue a free citizen centers on "reasonableness." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The

5

Fourth Amendment demands that an officer's decision to apply force be "objectively reasonable in light of the facts and circumstances" confronting the officer at the time. *Id.* The use of deadly force is reasonable when "the officer has good reason to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).

Quinn asserts that the decision to use deadly force in this case was reasonable in light of the facts available to him at the moment he fired at Wolford. The record supports his position. It is undisputed that Wolford emerged from his house holding a handgun, which he then raised and pointed in the direction of Mogul, who was standing in full uniform in Wolford's front yard. By all accounts, Wolford failed to heed repeated orders to drop his weapon and continued to point the pistol at Mogul up until the moment Quinn fired. Based on these circumstances, a reasonable officer in Quinn's position would perceive Wolford as a mortal threat to Mogul.

Plaintiff resists this conclusion on three grounds. Examining each of Plaintiff's arguments in turn, the Court finds them unavailing. First, Plaintiff argues that Mogul's alleged failure to identify himself as a police officer as he knocked on Wolford's door "unreasonably escalated [the] situation." (Pl.'s Opp'n Br., ECF No. 24, 15.) As Plaintiff sees it, Wolford may not have come to the door with a handgun had he known his visitor was a police officer. This position is specious. Putting aside factual issues – like the fact that Mogul was in uniform and there were two marked police cruisers in the street outside Wolford's house – Mogul's supposed failure to verbally identify himself was not a proximate cause of Wolford's death. *See Lamont*, 637 F.3d at 185 ("a § 1983 plaintiff must establish both causation in fact and proximate cause"). Rather, Wolford's decision to aim a gun at Mogul, even after he had been warned not to do so, was the

"superseding cause that broke the causal chain between [Mogul's actions] and the shooting." *Id.* at 186.

Plaintiff's second argument relies on the click from Wolford's gun moments before Quinn fired. (Pl.'s Opp'n Br., ECF 24, 15-16.) According to Plaintiff, a reasonable officer would have known that the *click* was a "dry fire" – that is, the noise an unloaded Glock handgun makes when its trigger is pulled – and deduced that there were no bullets in Wolford's gun. Plaintiff contends that it was unreasonable for Quinn to think the noise was related to the gun's safety mechanism because Glock handguns do not have safeties. *Id.* at 16. The Court cannot accept this reasoning. In the first instance, there is no evidence that Quinn ascertained the make of Wolford's handgun before he fired. The kind of gun Wolford used is irrelevant for purposes of the reasonableness analysis. *See O'Bert v. Vargo*, 331 F.3d 29, 36-37 (2d Cir. 2003) (explaining that the reasonableness inquiry "depends only upon the officer's knowledge of circumstances immediately prior to and at the moment" he used deadly force) (internal quotation marks omitted).

Furthermore, Plaintiff's argument assumes that a reasonable officer caught in an armed standoff would – on the basis of a metallic *click* – conclude that the suspect's Glock is inoperable. This expectation is inconsistent with the reasonableness standard, which recognizes the "fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving[.]" *Graham*, 490 U.S. at 396-97; *see Ballard v. Burton*, 444 F.3d 391, 403 (5th Cir. 2006) (upholding use of deadly force against a suspect brandishing a rifle "regardless of the direction in which [the suspect] pointed the rifle" or whether the officer "knew [the] rifle was uncocked or that it contained only a spent cartridge").

7

In his final argument, Plaintiff asserts that inconsistencies in the officers' accounts of the incident create a factual issue regarding the time elapsed between the "dry fire" and Quinn's shot. (Pl.'s Opp'n Br., ECF 24, 15.) According to Plaintiff, Quinn testified that he fired immediately after the click from Wolford's pistol, but Mogul recalled having enough time before Quinn's shot to re-aim his own gun and order Wolford to drop his. In fact, any inconsistency in the testimony of the two officers is very slight. Quinn merely testified that he fired after he heard the click from Wolford's pistol—he did not say he fired immediately afterwards, nor could he say with certainty what Mogul was doing at the instant he fired. (*See* Quinn Dep. 98-101.) In any case, the question is academic. Regardless of whether Quinn hesitated for one second or five after he heard the click, nothing transpired during that time to alter the reasonableness analysis. Thus, to the extent the testimony of Quinn and Mogul differed with respect to the exact timing of the fatal shot, the inconsistency is immaterial.

Viewing the evidence in the light most favorable to Plaintiff, no rational factfinder could conclude that Quinn's decision to fire on Wolford was unreasonable. Quinn is therefore entitled to summary judgment on Counts One and Three of the Complaint.

### B. Corporal Mogul's Liability

Plaintiff's claims against Corporal Mogul, who did not fire his weapon during the encounter with Wolford, can only be premised on his duty to prevent Patrolman Quinn from using unlawful force to subdue Wolford. *See Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002). Because Quinn's decision to use deadly force was reasonable, however, Mogul cannot be liable on a failure to intervene theory. *See id.*; *Nifas v. Coleman*, 525 F. App'x 132, 135-36 (3d Cir. 2013) (plaintiff who fails to establish constitutional violation "also cannot succeed on his

failure to intervene claim"). It follows that Mogul too is entitled to summary judgment on Counts One and Three.

### C. Remaining Defendants' § 1983 Liability

Similar reasoning applies to Plaintiff's civil rights claim against the Township of Ocean and Chief Frenz. In the absence of a constitutional violation, there can be no municipal liability under § 1983. *See Brown v. Pa. Dept. of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) ("for there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights"). In light of the Court's findings with respect to officers Quinn and Mogul, the Township and Chief Frenz are entitled to summary judgment on Count Two of the Complaint.

### D. Plaintiff's New Jersey Open Public Records Act Claim

Having disposed of Plaintiff's state and federal civil rights claims, the Court exercises its discretion under 28 U.S.C. § 1367(c)(3) to decline jurisdiction on Count Four of the Complaint, which arises under New Jersey's Open Public Records Act, N.J. Stat. Ann. § 47:1A-1 *et seq*. Accordingly, that claim is dismissed without prejudice.

### IV. Conclusion

For the reasons set forth above, and for other good cause shown, it is hereby ordered that Defendants' motions are granted with respect to Counts One, Two, and Three of the Complaint. Count Four is dismissed without prejudice. An appropriate Order follows.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: 2/24/14

9